**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **FRANKLIN CONSTRUCTION GROUP, LLC,** | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **No. 3:25-cv-01071** |
| **DEAN BINGHAM, LUNDON JOHNSON, JOEL CHEVRETTE, DANNY KNOWLES, SCOTT MATTHEWS, LOWE'S COMPANIES, INC., and LOWE'S HOME CENTERS, LLC,** | ) | |
| **Defendants.** | ) | |

**MEMORANDUM OPINION**

This is the second case filed by Franklin Construction Group, LLC ("FCG") alleging fraud by William Shore, his company, JWSC, LLC ("JWSC") and others. The others who assisted Shore in his alleged fraudulent misconduct includes HYDS, Inc. ("HYDS"), its owner and CEO and Lowe's Companies, Inc. ("LCI"), Lowe's Home Centers, LLC's ("LHC") and five individuals employed by LCI. In Franklin Constr. Grp., LLC v. Shore, 793 F.Supp.3d 928 (M.D. Tenn. 2025) ("Shore I"), the focus was on Shore's alleged fraudulent conspiracy with HYDS "to inflate FCG's material costs to enrich themselves." 793 F. Supp. 3d at 936. The Court denied the motion to dismiss HYDS, its owner and CEO because FCG alleged plausible claims. Id. at 942. As for LCI, LHC and LCI's employees – Dean Bingham, Lundon Johnson, Joel Chevrette, Danny Knowles and Scott Matthews, the Court in Shore I concluded they had been improperly joined so they were dismissed without prejudice. Id. at 935. In this case, FCG now again sues LCI, LHC and the same

LCI's employees, alleging they engaged in fraudulent misconduct to cause FCG to pay for construction materials that did not benefit FCG.

While FCG alleges six counts for relief, the four motions before the Court seek dismissal only of Counts I, II and III under Fed. R. Civ. P. 12(b)(6), and one motion by Chevrette challenges personal jurisdiction over him under Fed. R. Civ. P. 12(b)(2). FCG alleges LCI, LHC and LCI's employees violated the Racketeer Influenced and Corrupt Organization Act, 18 U.S.C. § 1961 et. seq. ("RICO") ("Count I") and engaged in a common law conspiracy ("Count II") and fraud ("Count III"). Bingham, LCI and LCH seek dismissal of Counts I, II and III. Johnson, Knowles and Matthews likewise seek dismissal of Counts I, II, and III. They also seek dismissal for failure to join an indispensable party under Fed. R. Civ. P. 12(b)(7) and 19(a) or, alternatively, for a more definite statement under Fed. R. Civ. P. 12(e). All motions are ripe for review. (Doc. Nos. 36, 37, 41, 44, 45, 46, 48, 49, 51, 52, 54 and 55).

## I. Factual Allegations[1]

As alleged in Shore I and again in this case, FCG is a construction company that employed Shore as its Vice President of Residential Construction Operations. (Doc. No. 1 at ¶ 2). Shore's job responsibilities included hiring suppliers and subcontractors, creating budgets and approving invoices, as well as handling day-to-day operations for some of FCG's construction projects. (Id.). After Shore was terminated, FCG discovered that Shore "in concert with the other Defendants, had been perpetrating a fraud" from September 2021 to September 2023 against FCG. (Id. at ¶¶ 27–28).

[1] The Court relies upon the factual allegations in the Complaint, assumes the truth of those allegations, and construes them and reasonable inferences from them in the plaintiffs' favor for purposes of ruling on the motions to dismiss. See, e.g., Erickson v. Pardus, 551 U.S. 89, 94 (2007).

FCG alleges two schemes that arose when "Shore and one or more of the Lowe's Individual Defendants [Johnson, Chevrette, Knowles, Bingham and Matthews] agreed that Shore would abuse his position as an employee of FCG." (Doc. No. 1 at 6). The first scheme evolved when "one or more of the Lowe's Individual Defendants would engage Shore" or his company to provide "'estimating' for Lowe's." (Id.). Then Lowe's, which FCG defines as LCI and LHC, hired Shore to "estimate" FCG projects that Shore was in fact managing. (Id.). Through the "fictitious" estimating schemes, Shore or his company would receive "monetary kickbacks" based on construction materials purchased from Lowe's and charged to FCG that the "Lowe's Individual Defendants knew were fraudulent." (Id.).

FCG alleges the "steps" Shore and the "applicable Lowe's Individual Defendants used to perpetrate this portion of their fraud upon FCG." (Id.). Initially, an unnamed project developer would provide Shore "project plans," who would "email to one of the Lowe's Individual Defendants" or "another Lowe's employee." (Id. at 7). Then, "one of the Lowe's Individual Defendants would copy and paste" the "project plans" link and send it back to Shore to request an estimate. (Id.). "Shore, posing as an independent third-party estimator" would send the "Lowe's Individual Defendant an email" that he received the request for an estimate. (Id.). Shore would then approve the requested "quantities" of construction materials. (Id.). Shore's "estimating" services included FCG projects for which he was and was not the FCG project manager. The Union Brick project was one such project that Shore was not the FCG project manager. (Id. at 8). Nevertheless, "one or more of the Lowe's Individual Defendants" engaged Shore to estimate lumber for the Union Brick project. (Id.).

The second scheme that FCG advances involved Shore and the Lowe's Individual Defendants "authorizing purchase orders to Lowe's" for construction materials that were "billed to and paid by FCG." (Id. at 10). These unauthorized purchase orders for construction materials

went to Shore's, not FCG, construction projects. (Id.). Shore used his knowledge of FCG projects so that he "and one or more of the Lowe's Individual Defendants [would] authoriz[e] [the] purchase orders" on behalf of FCG. (Id.). This resulted in FCG paying for construction materials not only for FCG projects but also Shore's projects. (Id.). The "estimating" and "purchase order" schemes were covered up when "one or more of the Lowe's Individual Defendants falsified" product codes and unit prices. (Id. at 16).

"To facilitate" the "estimating" and "purchase order" schemes, FCG maintains that "one or more of the Lowe's Individual Defendants arranged for Lowe's to issue Shore" or his company a Lowe's credit card that was billed to FCG. (Id. at 14). FCG alleges that Knowles "lied" that the credit card was for "in-store purchases" to "cover-up the fraud." (Id.). FCG then identifies certain charges on the credit card. FCG believes that the charges regarding the Ramirez project shows that "Bingham, Johnson, and Weber all knew [Ramirez] was not an FCG project but a side project of Shore's." (Id. at 15). Finally, FCG suggests that the credit card reflects earned income on Shore's side construction projects. (Id. at 15-16).

"Shore and one or more of the Lowe's Individual Defendants" not only falsified purchase orders, but also fraudulent bills to FCG for Shore's side projects. (Id. at 11). FCG identifies some of Shore's side projects. For example, Bingham was copied on an email for materials that went to a Shore project. (Id. at 11-12). Likewise, Johnson was on emails about Pella windows for Shore's Ramirez project. (Id. at 12). FCG alleges that the schemes allowed all of the Defendants to enrich themselves. (Id. at 16). This, says FCG, is apparent from purchaser orders that FCG made to Lowe's. Those purchase orders total over 30 million dollars. (Id.). After discovery of Shore's and his co-conspirators misconduct, FCG also found documents that it believes reflects "kickbacks" by Chevrette and Bingham to Shore. (Id. at 10). During the conspiracy, FCG has

documents that reflect a $13,500.00 payment by Chevrette and a $36,500.00 payment by Bingham to Shore or JWSC. (Id.). There was also a kickback payment by Shore to Bingham. (Id.).

## II. Analysis

For the reasons that follow, the Court will deny Chevrette's motion to dismiss and Johnson's, Knowles' and Matthews' motion to dismiss for failure to join an indispensable party will also be denied, but their motion for a more definite statement will be granted. All remaining motions are denied without prejudice pending FCG filing an amended complaint.

### A. Personal Jurisdiction

Chevrette moves for dismissal under Rule 12(b)(2) because this Court lacks personal jurisdiction over him. (Doc. No. 35). As a resident of North Carolina, he insists that he did not travel to Tennessee, did not conduct any business in Tennessee, and did not own, rent, open a bank account or pay taxes in Tennessee. (Doc. No. 37 at 2). He specifically denies that FCG was a Lowe's customer assigned to him, so he says that it is "untrue" that he gave Shore or his company $13,500.00 as a fraudulent kickback. (Doc. No. 37 at 3).

Chevrette does admit that he engaged with JWSC for "material takeoffs." (Id.). He explains that he was "instructed by [his] supervisor at Lowe's to use JWSC for material takeoffs," which is an estimate to determine how much material will be needed for a project. (Id.). "On just one occasion" while working for Lowe's, he used JWSC "to perform a materials takeoff estimate." (Id.). This request did not involve FCG, according to Chevrette. (Id. at 4).

Based upon FCG's repeated use of "Lowe's Individual Defendants" that includes Chevrette, it is fair to infer that Chevrette participated in the "estimating" and "purchase order" fraudulent schemes. This would include Chevrette making multiple contacts with Shore and his company as well as Lowe's and FCG's construction projects, all of which are in Tennessee. Additionally, Ben Schaedle, a FCG partner, reports that JWSC's financial records show fraudulent

transactions, including $13,050.00 of income from Chevrette. (Doc. No. 46-1 at 2). He also avers that JWSC sent multiple invoices to Chevrette and received payment from Chevrette in return.

FCG alleges specific jurisdiction over Chevrette. (Doc. No. 1 at 20). The Sixth Circuit has longed applied the three-part test developed in Southern Machine Company v. Mohasco Indus., Inc., 401 F.2d 374, 381 (6th Cir. 1968) to determine if a court has specific jurisdiction over a person:

> First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.

"Purposeful availment" means the defendant has engaged "in some overt actions connecting [it] with the forum state." Carrier Corp. v. Outokumpu Oyj, 673 F.3d 430, 450 (6th Cir. 2012) (citation omitted). The second factor, "arising from," is met when the cause of action is connected or related to the defendant's contacts with the forum state. Youn v. Track, Inc., 324 F.3d 409, 419 (6th Cir. 2003) (citations and quotation marks omitted). The third prong, reasonableness, requires that the defendant's acts or consequence "have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable." Intera Corp. v. Henderson, 428 F.3d 605, 618 (6th Cir. 2005) (citation and quotation marks omitted). If the first two elements are satisfied, then an inference arises that the third factor, fairness, is also met. Am. Greetings Corp. v. Cohn, 839 F.2d 1164, 1170 (6th Cir. 1988) (citation omitted).

The totality of FCG's allegations and Schaedle's and Chevrette's statements sufficiently connect Chevrette to the fraudulent schemes in Tennessee alleged by FCG. That makes it fair and reasonable for this Court to exercise specific jurisdiction over Chevrette in Tennessee. FCG and Chevrette agree that he sent $13,500.00 to Shore's company in Tennessee. They disagree on the

reason he did so, but accepting as truthful FCG's allegation, this establishes that Chevrette intentionally engaged in business in Tennessee. He also concedes that he purposefully acted in Tennessee through his "material take-offs" estimate activity. While the Court appreciates that Chevrette maintains that the "material take-offs" had nothing to do with FCG, the allegations of the fraudulent "estimating" and "purchase order" schemes suggest otherwise. His repeated engagement with Shore, who lead the alleged conspiracy to defraud FCG in Tennessee, is the subject matter of this case. As such, it is fair for Chevrette to defend his actions in Tennessee. The three-part Mohasco test is satisfied. Chevrette's motion to dismiss will be denied.

B. Failure to Join an Indispensable Party

Johnson, Knowles and Matthews seek dismissal because FCG failed to include Shore and JWSC as parties in this case. They argue that Shore and JWSC are indispensable parties because Shore conceived and orchestrated the "estimating" and "purchase order" schemes, so he is responsible for any damages. (Doc. No. 41 at 9-10). Further, they maintain that Shore and JWSC's absence prejudices them and other parties and without Shore, complete relief to FCG is not possible. (Id.).

These defendants rely on Fed. R. Civ. P. 12(b)(7) for dismissal, and Fed. R. Civ. P. 19(b) governs whether an absent party must be joined. Sch. Dist. of City of Pontiac v. Sec'y of U.S. Dept. of Educ., 584 F.3d 253, 264 (6th Cir. 2009). The first step to determine if a party is indispensable is whether the court can fashion "complete relief among the existing parties." Fed. R. Civ. P. 19(a)(1). Courts employ a practical approach that turns on whether the court can provide "meaningful relief" if the plaintiff prevails. Sch. Dist. of City of Pontiac, 584 F.3d at 265. Here, FCG's "Prayer for Relief" asks for a money judgment "against all Defendants, jointly and severally" for damages due to RICO violations and fraud. (Doc. No. 1 at 29). This allows all Defendants to point the finger at Shore and his company and to each other to reduce their damages

exposure. The Court can fashion complete relief to FCG. After all, FCG has already obtained a judgment in the amount of $24,892,407.57 against Shore and JWSC, jointly and severally, in Shore I. (Doc. Nos. 146 and 147, Case No. 3:24-cv-1255).

C. Motion for a More Definite Statement

As the Court discussed in Shore I, for FCG to survive a motion to dismiss, the Complaint must satisfy Fed. R. Civ. P. 8's requirement of a short and plain statement of the claim and Fed. R. Civ. P. 9(b)'s particularity requirement on its RICO and fraud claims. 793 F. Supp. 3d at 939. Each of the pending motions to dismiss Counts I, II and III, challenge whether FCG's RICO, conspiracy and fraud claims allege sufficient factual allegations that plausibly state a claim.

FCG's use of group or collective pleading to describe the alleged fraudulent conduct of the five LCI employees as "Lowe's Individual Defendants" does not comply with Rule 9(b)'s specificity requirement. The reason is simple, by lumping all individual Defendants together the Court cannot identify each Defendant's particular conduct. Construction Management, Inc. v. Expo Hospitality, LLC., No. 3:19-CV-00298, 2020 WL 489461, at *4. (M.D. Tenn. 2020) see also In re E. I. du Pont de Nemours & Co. C-8 Pers. Inj. Litig., 87 F.4th 315, 320 (6th Cir. 2023) (finding that the plaintiff could not sue ten defendants and lump them together as a collective because each plaintiff must tie his injury to each defendant); Hoover v. Langston Equip. Assocs., Inc., 958 F.2d 742, 745 (6th Cir. 1992); (finding that the plaintiff's use of "the Defendants" does not satisfy Rule 9(b) in a RICO and fraud case).

Kerrigan v. ViSalus, Inc., 112 F. Supp. 3d 580 (E.D. Mich. 2015) is instructive and persuasive to the Court. There, the plaintiff brought RICO claims against multiple defendants. "Throughout the Complaint - and in the RICO section in particular – plaintiffs lump[ed] together the defendants without specifically identifying which of the defendants engaged in the conduct alleged." Id. at 600. The Kerrigan Court simply could not perform a Rule 12(b)(6) analysis

because the plaintiffs' group pleading "made the Court's analysis of plaintiffs' RICO claims extraordinarily difficult, if not impossible." Id. at 602. The Court acknowledged that plaintiffs may state a RICO claim against some defendants, but the Court could not do so for each of the 31 defendants. "And that is a real problem because each Defendant is entitled to an individualized analysis of his, her or its own RICO liability." Id. Therefore, the Kerrigan court ordered an amended complaint. 112 F. Supp. 3d at 619.

The Kerrigan Court's analysis rings true here because FCG uses group pleading to bring RICO and fraud claims. The "real problem," as in Kerrigan, is that each Defendant – Bingham, Johnson, Chevrette, Knowles and Matthews – are entitled to an individualized determination of whether their actions and inactions support RICO, conspiracy and fraud liability. 793 F. Supp. 3rd at 602 (citing Gross v. Waywell, 628 F. Supp. 2d 475, 495 (S.D.N.Y. 2009) (recognizing that plaintiffs must demonstrate the elements of RICO with respect to each defendant individually) (collecting cases)). This Court cannot do so given FCG's use of group or collective pleading to describe the behavior or conduct of each individual Defendant's allegedly illegal activity.

In the context of RICO claims against five individual defendants and two corporate entities, FCG's use of group pleading is particularly problematic. To plausibly allege a RICO claim for each defendant, for example, FCG alleges that each Defendant engaged in mail and wire fraud racketeering activity. (Doc. No. 1 at 22). FCG then alleges that Defendants and nonparties Shore, JWSC and Weber conspired or aided and abetted each other to violate the federal mail and wire fraud statutes, which FCG identifies as the required two predicate acts of racketeering under 18 U.S.C. § 1961(l). (Id.). Again, the Kerrigan decision is instructive to this Court. While the Court may be able to infer that Chevrette and Bingham likely used the mail or wire services when they sent Shore thousands of dollars of kickback money, (Doc. No. 1 at 10), it can't do so for the remaining defendants. This was precisely the holding in Duran v. Equifirst Corp., No. CIVA2:09-

CV-03856, 2010 WL 936199 (D.N.J. Mar. 12, 2010) when the Court condemned plaintiffs' use of group pleading and held that plaintiffs' alleged six predicate RICO acts were defective because plaintiff alleged every defendant committed all six predicate acts. Id. at *4. Likewise, in this Circuit, the Court in Corp. Auto Res. Specialists, Ltd. v. Masson, No. 19-10452, 2019 WL 4074436 (E.D. Mich. Aug. 29, 2019) applied Kerrigan to conclude that the plaintiffs mail fraud predicate acts allegations failed to identify which defendants "caused what fraudulent statements to be mailed, or when the statements were mailed." Id. at *4. As such their allegations failed Rule 9(b)'s particularity test. Id. The Court ordered plaintiff to file an amended complaint. Id. at *5.

FCG's pleading misstep makes Defendants' motion for a more definite statement fully justified. Rule 12(e) requires a more definite statement of a pleading when it is vague or ambiguous. Fed. R. Civ. P. 12(e). As discussed, the Complaint "'fails to specify the allegations in a manner that provides sufficient notice'" to the Defendants or this Court. Evans-Marshall v. Bd. of Educ. of Tipp City Exempted Vill. Sch. Dist., 428 F.3d 223, 228 (6th Cir. 2005) (citation omitted). Accordingly, Defendants' motion for a more definite statement will be granted.

An appropriate order will be entered.

WAVERLY D. CRENSHAW, JR.
UNITED STATES DISTRICT JUDGE



Case 3:25-cv-01071 Document 76 Filed 09/28/26 Page 10 of 10 PageID #: 583